IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JULIE ANN GREEN,

        Plaintiff,

vs.

Case No. 05-1130-JTM

DERBY ENTERPRISES, INC., and
BRANDON FRAZIER,

        Defendants.

MEMORANDUM AND ORDER

    Plaintiff Julie Ann Green has brought this Title VII sexual harassment case against her former employer, Derby Enterprises. Derby Enterprises is a holding company that owns and operates the Derby Bowl. First, Green claims she was subjected to a hostile work environment due to the actions of Brandon Frazier, the son of Dart Frazier, the manager of the Derby Bowl. Second, she argues she was constructively discharged in April 2003 as a result of ongoing harassment. Finally, Green claims she is entitled to punitive damages.

    Defendant Derby Enterprises seeks summary judgment, arguing that Green never informed Derby Enterprises of alleged harassment. Defendant Brandon Frazier seeks summary judgment on the grounds that plaintiff's claim is contrary to the statute of limitations.

    Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).

The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

**Findings of Fact**

Green worked for Derby Enterprises from February 2001 to April 23, 2003. When she started working at the Derby Bowl, she was working two days a week, for five hours each day. She earned $6.50 per hour.

Derby Enterprises is owned by Dart and Derek Frazier and their parents Dale and Doris Frazier. Dart managed Derby Bowl and Derek managed Seneca Bowl. Dart consulted Dale on business and policy decisions.

For a period of time Green was also working for an animal clinic at the rate of $5.25 per hour. She worked six or seven hours a day for three to four days a week at the animal clinic. She also worked

as a waitress at a Spears restaurant during her tenure at Derby Bowl. Green claims that defendant Brandon Frazier, throughout her employment, made offensive comments to her and had unwanted physical contact with her.

Brandon Frazier is the son of Dart Frazier, the manager of the Derby Bowl. Most of the time during Green's tenure at Derby Bowl, Brandon was not an employee, but occasionally worked at the Derby Bowl. He mowed grass in the summer of 2001 and worked the counter and was a pin chaser from January 13 to March 25, 2002. He sometimes worked in the pro shop in the evening, when Green worked as a waitress. Kathie Allen, the snack bar supervisor and youth coach, has stated that Brandon would walk into the office whenever he wanted, use the office telephone when she needed to do computer work, bossed people around, and generally had the run of the place. However, it is uncontroverted that at no time did Brandon Frazier have any supervisory authority over Green.

Green resigned her employment in April of 2003 by giving Dart a letter of resignation. The April 19, 2003 letter gives two weeks' notice and states:

> With everything going on right now, I feel it would be better if I left.
>
> I love my job and a lot of the people there, but I just can not do it anymore. With me still working for you it has made my life so hard.
>
> I am scared to come to work. I am scared at work. I am scared in my own home! It is very hard for me to come to work, and get asked a lot of questions that I know I can not answer. Plus it is to hard to come in and have your son stand as close as he can without touching me, for him and his friends to watch every move I make, and for him just to play with my head like that. I can not do it anymore. I will not do it any more. I am not going to let him pull me back in a frame of mind that took me over 3 years and a hospital stay, and medication to pull me out of. I am sorry, but I will not do it anymore. So your son wins I am leaving my job, so he can feel better about walking into the bowling ally.

(Stip. 4.b.19)

Dart read the letter. He discussed it with his brother Derek and Derek's wife, Tanya Frazier. Dart did speak with Green after she delivered the letter. He does not remember discussing the contents of the letter with Brandon. If Brandon was still harassing Green as stated in the letter, it was contrary to Dart's instructions to Brandon, and the conversation he had with Brandon after Allen had reported

3

inappropriate conduct. Dart did not do anything to investigate the statements in the letter that Brandon was still bothering Green.  Brandon is still allowed on the premises of Derby Bowl.

Green was born in Wichita on October 30, 1984; Brandon was born December 26, 1980. Brandon met Green at the bowling alley when she was in elementary school. They did not socialize. Green began bowling at Derby Bowl when she was three years old and bowled in the Derby Bowl youth leagues.

Brandon admits that he physically touched Green at the Tilman wedding reception on May 6, 2000. It was on the hood of a car out away from the reception by a barn or junkyard. Brandon kissed her, unsnapped her bra, grabbed her breasts and attempted to undo her pants. She wanted him to stop. She was 15 years old. He was 19 years old.

Green described the incident:

> [H]e grabbed my arms, pushed me backwards over the hood of the car, and at that point he started lifting my shirt up, took my shorts off, took my bra off and took his pants off, and I kept telling him, I'm like, "What are you doing? What are you doing? Leave me alone." And he just -- he would not stop. So I pushed him off me, put my shirt and my bra back on, pulled my pants up and started walking off. He followed me, grabbed me, picked me up and put me back on the ground on my back and laid on top of me, put his knees in my thighs and put his hands over my shoulders so I couldn't get up. And I asked him, I'm like, "Let me up. Let me up." He's like "The only way the only way I'm letting you up is if you kiss me." I gave him a quick kiss on the cheek and tried to let my whole body kind of sit up, and he took off, and I took off running trying to get up that hill and get back with everybody else.

(Green dep. at 42-43).  This incident occurred before she began working at Derby Bowl in February 2001. She gave thought to how she would handle Brandon when she went to work at Derby Bowl. She needed the job to make her car payments. She hoped the incident was a one-time event and would not happen again. Green did not report the wedding reception incident to anyone with authority until she was admitted to Good Shepherd Hospital in March 2002, after the rape. On April 2, 2002, her mother filled out a child abuse/neglect report mentioning the incident at the wedding in 2000.

Green testified she was sexually assaulted by Brandon again on January 8, 2002 in the party room at Derby Bowl where they stored tables, chairs and supplies for parties. The room is locked and requires a key. It is at the back of the bowling alley in a hallway by itself.  She testified:

> Mr. Frazier followed me in, and from that point he grabbed me, he turned me around, put my hands above me, held over my wrists (indicating), and from there he started — he took my pants off and started from there, and — I'm sorry. He decided, he told me, he was like, "I wanted to do this for a long time," and I just kept saying "No, just let me go, please," and I was fighting to try to get one of my hands free, and he said, "No, I've wanted to do this for a long time." So at that point I was still fighting. He had my pants pulled almost completely down and started to put his fingers inside of me. I fought, got one of my hands free, I grabbed the key, which is attached to the top of a bowling pin. I took it, and I hit him. He fell backwards. I pulled my pants up and ran across the hall into the bathroom.

(Green dep. at 12-13). She screamed and yelled as loud as she could while he was attacking her. No one heard her. Dart was not there that day. After Green returned from the bathroom, Brandon told her that he would physically harm her if she told anyone. He leaned close to her and said, "If anyone finds out, if you tell somebody, I will physically hurt you." She believed the threat and was afraid of him. Green was afraid of Brandon because of his threat, but, she did not quit her job at that time. She needed her job to make her car payments and she was afraid to quit. Green was 17 years old at this time. Brandon was 21. Brandon denies this event occurred.

Green did not report the rape to anyone until she was admitted to Good Shepherd Hospital in March 2002 with self-mutilative behavior and suicidal ideation. In her hospital discharge summary, she reported sexual abuse at work.

Green testified that the next incident was an attempted rape on September 30, 2002. That incident took place late in the afternoon during her shift. She was still cleaning up from one of the leagues, getting prepared for open bowling. She was taking paperwork back into the office to put away in the file cabinet. Brandon was behind the counter. He followed her into the office, shut the door and locked it from the inside. He told her, "I'm going to finish what I started." He started to do the same acts as he did on January 8, 2002 and she reacted the same way. Unfortunately, there was music on from the bowling leagues so no one could hear her screams. Brandon denies this event took place.

Another incident with Brandon occurred right after the criminal charges were filed against him. Green was going to the kitchen to put something away after a league had finished. She was in the walkway between the bar and the kitchen. Brandon walked up to her and "just full-out punched her right arm" and said, "Oh, wait, I'm not allowed to touch you. I'll get in trouble". Then he walked off.

5

Brandon denies punching Green in the arm. He does not admit touching Green at any time after the 2000 wedding reception.

Derby Bowl records show that Green's last day of work was April 23, 2003. Before her last day of work, Brandon touched her again. She was in the office looking at a revised schedule for the next month for one of her co-workers who had called on the telephone. Green was talking on the phone. Brandon came from behind her and wrapped his arms around her. This was in the evening about 6:30 or 7:00 o'clock. He pulled her close to where his chest was pressed up against her back. He said, "Hey, baby, move it." She could feel him aroused against her back. Brandon denies putting his arms around her or any type of horseplay with her. This event was after Green had told Dart about the previous acts of harassment.

Even before January 8, 2002, there were occasions in the workplace when Brandon would slap Green on the buttocks and make comments that he wanted to finish what he had started. If Brandon started to do something like that after she complained to Rob Wood, Wood would call her over to get her away from Brandon. She never saw Wood reprimand Brandon for doing these types of things. She never saw Dart reprimand Brandon for doing these things. Brandon denies slapping Green on the buttocks.

Green alleges that Brandon was given special treatment by the employees at Derby Bowl. They were told to let Brandon and his buddies bowl for free. Brandon could bring food into the alley from outside. Brandon was allowed to consume alcohol after they would have cut off anyone else. He was always drinking in the bar. He drank excessively. He had been drinking when he assaulted her on September 30, 2002.

On April 29, 2003, after Green resigned her employment at Derby Bowl, she obtained a temporary order of protection against Brandon in Sedgwick County District Court, Case No. 03DM2704. On May 9, 2003, the order was continued to May 21, 2003 until the sentencing in the criminal matter. She obtained the order because she was afraid Brandon would come to her home. At

the sentencing in the criminal case, a condition of Brandon's probation was that he avoid any contact with the victims, M.K.S. and Green. There was a no-contact order.

Brandon ignored the no-contact order and continued to harass Green. She saw him at baseball games and he leaned against her car throughout one game.

Green has testified that at some unspecified time, she told Kathie Allen she had been raped, but did not identify her assailant. She told Kathie she was worried about her father and how he would react. Green has testified that she tried to protect herself from Brandon by staying with other employees or where someone could see her at all times. Even after the 2000 wedding, she tried to avoid being alone with Brandon. When she bowled, she stayed with her teammates.

Green filed a Petition in Sedgwick County District court against Derby Enterprises, Inc., Dart Frazier and Brandon Frazier in January of 2004. The Petition is date-stamped January 8, 2004. The case was assigned Sedgwick County District Court Case No. 04 CV 0111. On January 9, 2004, Julie Green filed a charge of discrimination against Derby Enterprises, Inc., with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a Right to Sue letter on March 9, 2005. On April 5, 2005, Green amended her state court Petition to include sexual harassment claims.

As noted earlier, Green contends Brandon sexually assaulted her on or about January 8, 2002, and attempted to rape her on or about September 30, 2002. At her deposition, Julie Green testified that after reviewing a calendar she believed the assault happened on August 5, 2002.

Asked in an interrogatory to identify every complaint she made about Brandon Frazier to management of Derby Bowl. Green answered:

> I made verbal complaints to the night manager, Rob Wood, during the months of October, November and December 2001. Rob Wood personally protected me from Brandon Frazier on several occasions by making Brandon stay away from me. Brandon Frazier always came back and started harassing me again. I made a complaint to Dart Frazier in late May or early May, 2003 after I obtained a temporary protection from stalking order when Brandon physically grabbed me and hit me in the shoulder in Dart Frazier's presence. I have told Dart Frazier that I had a court order protecting me. He took no action and Brandon was allowed unrestrained access to the bowling alley up to the date I resigned, May 13, 2003.

(Def. Exh. D).

When asked at her deposition what she told Rob Wood, Green testified that she did not explain the nature of her concerns, only that Brandon made her "uncomfortable," and that she wanted him kept "at a distance." In response, Rob tended to try to keep Brandon and Green apart while he was working. At her deposition, Green said that the complaint she made to Dart Frazier in 2003 was when she resigned. At her deposition, Green retracted the statement that the punching incident occurred in front of Dart Frazier.

In July of 2002 as she was going on medical leave, Allen approached Dart Frazier and told him that Brandon had been engaging in inappropriate sexual behavior or activities with customers and employees. Specifically, Allen and Dart discussed the fact that Brandon had sex in the pro shop with a waitress named "Anna." Dart made a comment about it to Allen. Brandon admits this incident. In addition, Allen reported that Brandon had (a) thrown a young female kitchen worker named "Chelsea" into the walk-in cooler by the freezer and attempted to kiss her, (b) approached a married female employee named "Carolyn" and asked her to sleep with him, and (c) grabbed a waitress named "Rhonda" from behind and grabbed her breast. Brandon admitted the incident with Rhonda and admits asking Carolyn something that was "sexually related" that could be taken as asking her to have sex with him. Allen told Dart " to get control of Brandon before someone really got hurt or his place of business was damaged by the actions of his son." (Plf. Exh. F, at 81).

The defendant stresses that the only touching Allen ever personally saw between Brandon and Green was that Brandon sometimes put his arm around plaintiff Green. And she never heard Brandon make any sexual comment to Green. Allen has testified that Green never reported any improper touching or comments to her. As noted earlier, Green has testified that at some point in late 2002, she told Allen about Brandon's attempted rape of her on September 30, 2002.

Kathie Allen remembers Dart telling Brandon many times to "straighten yourself up" or "you need to get your act together." (Allen dep. at 40). After Allen reported Brandon to Dart, Allen felt that Brandon was still the same. He continued to put his arm around females. He continued to flirt. He continued to touch female employees.

Dart Frazier has testified that he recalled a conversation with Kathie Allen about Brandon, but he does not recall her giving him much in the way of specifics. He did come away with the understanding that Allen felt Brandon was engaging in inappropriate sexual relationships with customers and employees. He testified that as a result of the conversation with Allen, he called Brandon into his office and "told him I had better never hear of him having any relationships whatsoever with any employee and/or customer of Derby Bowl ever again." (Frazier dep. at 81-82). He did not take any other action. He did not discuss the issue at that time with his brother Derek or his father Dale Frazier, who also were officers, directors and shareholders.

Brandon Frazier testified he had this conversation with his father:

> He said that he heard or had received a complaint about touching or horseplay with female employees or customers. He never specified anybody's name. And he said that I needed to from there on keep my hands to myself, don't mess with or touch anybody or just, you know, act more presentable. Don't touch anybody or flirt with them.

(Brandon Frazier dep. at 102-103). He also testified that his father did not tell him of any consequences that Brandon might suffer if he again touched any female employees or customers. He does not remember Dart actually asking him if he had been touching female employees or customers or having sex with an employee at Derby Bowl.

On March 25, 2003, a criminal complaint was filed in Sedgwick County District Court against Brandon Frazier charging him with attempted aggravated battery of Julie Green. Specifically, the complaint charged Brandon with two counts of aggravated battery, to-wit: intentionally forced sexual intercourse with Green on two separate occasions, January 8, 2002 and September 30, 2002, and similar forced sexual intercourse with another female Derby Bowl employee, M.K.S. on January 12, 2003. Dart Frazier has testified that he did not learn of these allegations until shortly before they were filed.

Dart knew about the incident with M.K.S. right after it took place in January 2003, but first learned about the allegations involving Green before Brandon's court appearance. He spoke to Brandon immediately upon learning about the allegations. Brandon denied having any sexual contact with Green in January or September 2002. Dart did not ask Brandon if he had physically touched Green.

9

As manager of Derby Bowl, Dart had concerns about the accusations against Brandon, but, neither he or anyone else did anything to investigate the accusations other than to talk to Brandon. Green testified she told Dart about Brandon touching her. She told him that the police had contacted her. She wanted to tell him before he heard it from the police that his son had sexually harassed her more than once in the past. She felt that he did not deserve to find out from the police. He deserved to find out from her that it had happened. This was before Brandon went to court.

Brandon Frazier pleaded nolo contendere to the charges.

In response to the criminal charges and the nolo contendere plea, Dart Frazier told Brandon that he should avoid being on Derby Bowl premises at any point in time when Green might be working. That meant that Brandon was to avoid evenings when Green would work, including Brandon's participation in any evening bowling league. Shortly thereafter, in late March or early April, Dart Frazier banned Brandon from the Derby Bowl. He did this because he thought it would be better for business. The ban was to avoid a confrontation because of the criminal case. Brandon was barred from participating in the bowling leagues, primarily for evening hours when Green would be present. Brandon came in to eat.

As noted earlier, Green claims that Brandon Frazier punched her in the arm and also sexually harassed her in April or May 2003 while at the Derby Bowl. She claims Brandon put his arms around her and grabbed her from behind and stood very close to her. Green claims in the Pretrial Order that Dart Frazier was present and failed to take action to restrain Brandon, but at her deposition she retracted her statement that Dart was present at the incident.

Derby Enterprises did not have an employee handbook, personnel manual, company rules or a policy concerning sexual harassment. There was no indoctrination for new employees about sexual harassment.

**Conclusions of Law**

Derby Enterprises argues that summary judgment should be issued on Green's claims of sexual harassment against it, contending that the plaintiff has failed to demonstrate it had any actual or constructive knowledge of Brandon Frazier's conduct. It stresses that Green did not fully inform Dart Frazier of her allegations about Brandon until March of 2003, just before she left her employment. In support of this argument, Derby Enterprises notes that when Green spoke earlier with Rob Wood, she merely indicated that she felt "uncomfortable" around Brandon, and that she did not give any details of the sexual assaults. After March of 2003, the defendant acknowledges, there are allegations of Brandon punching and fondling Green, but — the defendant argues — "there are absolutely no witnesses to this."

The parties essentially do not dispute the applicable legal standard. There is no argument that what Green experienced on the job would not be considered a pervasively hostile work environment. The issue is whether the defendant had notice of the alleged actions of Brandon Frazier, and whether it took corrective action to protect its employees. *See Lockard v. Pizza Hut*, 162 F.3d 1062, 1073-1074 (10th Cir. 1998) (providing that an employer may be liable for tolerating an abusive environment created by a co-worker of customer). An employer who knows, or has reason to know, of a hostile work environment may be liable under Title VII if it fails to take effective corrective action. *Id.* at 1074.

The court finds that summary judgment should not be granted in favor of the defendants. First, it is simply incorrect that there are no witnesses to the April, 2003 punching and fondling: the plaintiff has stated under oath that these events occurred, and under the standards relating to summary judgment the court accepts that these incidents did in fact occur. More generally, the court finds that the defendant's approach, which focuses separately on what Green and Allen reported, looking at each report in isolation, fails to justify an award of summary judgment. That is, it has not been established beyond a reasonable doubt that Derby Enterprises acted reasonably in light of all of the information available to it.

From Green, the defendant knew that the plaintiff felt "uncomfortable" around Brandon, and specifically requested that he be kept away from her. And while it is true that Green did not give any

details about the reason for her request, it appears equally true that the defendant made no attempt whatsoever to investigate what was happening. And from Allen's conversation with Dart Frazier in July of 2002, the defendant was given information which could have alerted it to a likely reason for Green's request. Specifically, Allen told Dart Frazier that his son was having sex in the pro shop with a waitress named "Anna." Although the record is silent as to the size of the wait staff at the bowling alley, it is unlikely to be so large as to justify defendant's failing to make any connection between Allen's report and Green's request.

Further, of course, Allen also reported additional acts by Brandon at the bowling alley. He was reported to have thrown a female kitchen worker into the walk-in cooler by the freezer and attempted to kiss her, that he had approached a married female employee and asked her to sleep with him, and that he had grabbed a waitress from behind and grabbed her breast. That these were not purely consensual encounters was reflected in Allen's request that Dart Frazier "get control" of his son before the business was seriously damaged.

Nevertheless, in spite of this information, defendant undertook no effective remedial action. It undertook no investigation of any sort to uncover what was actually happening. Instead, according to Allen, Brandon was simply told –– again, as he had been many times –– to "straighten yourself up" or "you need to get your act together." The defendant made no attempt during 2002 to effectively correct the harassing environment. According to Allen, Brandon's behavior remained the same after this oral advice to "straighten up." The defendant made no attempt to ban Brandon from the bowling alley until 2003, *after* the plaintiff had filed formal criminal charges against him. And even then, defendant has failed to show what steps it implemented to create or enforce this "ban" which nevertheless allowed Brandon to again appear at the bowling alley and assault plaintiff in April of 2003. By that time, the defendant should have know that purely hortatory guidance to Brandon was not effective.

Here a rational finder of fact could conclude that plaintiff was subjected to a hostile working environment at Derby Bowl. It could also find that defendant knew of, or had reason to know of, the existence of that environment, and failed to take effective corrective action. And, because the

environment here included actions which were of the most seriously offensive nature, including attempted forcible sexual intercourse, because the actions were perpetrated by the boss's son, and because the management of the defendant has failed to show that it undertook to correct the situation by any means other than reiterating the same sort of previously ineffective "get your act together" recommendations to the perpetrator, a finder of fact could also reasonably conclude that Green's employment situation was so intolerable that a reasonable worker in her position would have also felt compelled to resign. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147 (2004). Accordingly, the court will not grant summary judgment as to Green's claim of constructive discharge.

Finally, defendant Derby Enterprises seeks dismissal of Green's claim for punitive damages. Under 42 U.S.C. § 1981a(b)(1), an award of punitive damages may be awarded under Title VII where the plaintiff shows that the defendant acted "with malice or with reckless indifference to her federally protected rights." For purposes of assessing punitive damages, the terms "malice" and "reckless indifference" here "refer not to the egregiousness of the employer's conduct, but rather to the employer's knowledge that it may be acting in violation of federal law." *Kolstad v. American Dental Association*, 527 U.S. 526 (1999). Malice and reckless indifference may be inferred if an employer's management fails to respond to complaints despite knowledge of serious harassment. *Baty v. Willamette Industr.*, 172 F.3d 1232, 1244-45 (10th Cir. 1999). In light of the foregoing evidence, the court cannot say that the plaintiff will be unable to meet this burden. Accordingly, the plaintiff's claim for punitive damages will remain in the case.

Defendant Brandon Frazier seeks summary judgment on the grounds that the assault and battery charges advanced against him are time-barred. Specifically, he argues that the one-year statute of limitations for assault and battery contained in KSA 60-514(b)(1) bars any claim for incidents prior to January 8, 2003. The defendant also argues that the plaintiff is attempting to circumvent this time bar by pleading her assault and battery claims as outrageous conduct, in order to fall within the two-year limitations period of KSA 60-513(a)(4).

Green in her response "agrees that she may not recover damages for injuries she suffered resulting from a discrete assault or battery by Frazier which occurred outside of the one-year statute of limitations," but stresses that the incidents occurring in 2003 are not time-barred. (Resp. at 2-3). Accordingly, there is no substantial dispute between the parties as to this element of defendant Frazier's motion.[1]

Green argues, however, that the same conduct is actionable and not time-barred as evidencing the tort of outrage. Under Kansas law, extreme and outrageous conduct is actionable as a discrete tort if a recitation of the facts to an average member of the community would arouse his or her resentment against the actor. *Dawson v. Associated Financial Services*, 215 Kan. 814, 529 P.2d 104 (1974). Plaintiff argues that Kansas law would permit consideration of the earlier sexual assaults for purposes of considering the tort of outrage, and cites language in *Smith v. Welch*, 265 Kan. 868, 882-883, 967 P.2d 727, 736 (1998), a case involving sexual battery by a physician, where the court concluded that the allegations of inappropriate touching would constitute "invasion of privacy, assault, battery, and sexual battery and those claims, in the context of a medical examination, are outrageous."

*Smith,* however, did not involve any question of the applicable statute of limitations; the claims there were timely advanced, however denominated. With respect to permitting the circumvention of typically shorter statutes of limitations by assault and battery through the device of denominating a claim as another tort, it has been stressed that "courts have been particularly careful to use the statute of limitations applicable to the facts and not the label." *Dickens v. Puryear*, 45 N.C.App. 696, 263 S.E.2d 856, 859 (1980), *reversed on other grounds*, 302 N.C. 437, 276 S.E.2d 325 (1981) (*citing Maes v. Tuttoilmondo*, 31 Colo.App. 248, 502 P.2d 427 (1972); *Thomas v. Casford*, 363 P.2d 856 (Okl.1961); *Borchert v. Bash*, 97 Neb. 593, 150 N.W. 830 (1915)).

---

[1] Green does argue that the incidents prior to 2003, while not giving rise to a cause of action themselves, may still be used as evidence to show a pattern of conduct by the defendant. This issue was not addressed in the defendant's motion, and may if necessary be addressed by a future motion in limine.

14

In *Dickens*, the plaintiff alleged that he had been kidnaped, bound, beaten, and threatened with immediate and future death or castration by the defendants, allegedly in retaliation for abusing their minor daughter. The plaintiff's claim, denominated as intentional infliction of emotional distress, was filed after the applicable limitations period for assault and battery but before the limitations period governing other torts. The North Carolina Court of Appeals wrote that where "the gist of a claim for relief is assault and battery, courts have applied the statute of limitations applicable to assault and battery despite allegations in the complaint that it was some other tort. This is particularly true where it appears the purpose in the use of a label different from assault and battery is to provide a different and longer statute of limitations." 263 S.E.2d at 859. The court's holding was later partially reversed; the North Carolina Supreme Court holding that the plaintiff could advance some outrage claims under the longer limitations period –– but only that part of the plaintiff's claims which alleged threats of future injury if the plaintiff did not leave the state, since such threats did not involve threats of imminent or immediate harm and hence were not actionable as assault or battery, but only as outrageous conduct. 302 N.C. at 454-55.

Similarly, in *K.G. v. R.T.R.*, 918 S.W.2d 795 (Mo. banc 1996) the Missouri Supreme Court refused to apply the longer limitations period for intentional infliction of emotional distress to the claims of childhood sexual abuse raised by the 28-year-old plaintiff, concluding that "there is no independent action for intentional infliction of emotional distress where the existence of the claim is dependent upon a battery." Id. at 800.

The court will grant defendant's motion for summary judgment as to the claims of rape or attempted rape prior to 2003. At their core, these claims reflect assault and battery and are subject to a one-year limitations period under Kansas law. Here, the acts of the defendant prior to 2003, as alleged in the Pretrial Order, all involve either direct and immediate threats of physical harm, either "rape," "attempted rape," or "unwanted physical contact." (Pretrial Order, at 5). Accordingly, the court will grant summary judgment to the extent that plaintiff seeks to recover for the pre-2003 incidents under a claim of outrage.

The court notes that defendant's motion argues only generally that Green is seeking to circumvent the statute of limitations by her claim of outrage. He does not advance the additional argument that the incidents in 2003 are insufficient in themselves to constitute the tort of outrage. Since there is no limitations problem as to these incidents, the court will follow the general rule expressed in *Smith v. Welch*, holding that these same claims may be expressed as either assault and battery or as the infliction of emotional distress.

Finally, defendant Frazier seeks dismissal of Green's claims of punitive damages against him. But this argument rests largely on the assumption that the only actionable incidents are those which occurred in 2003, and that the others are time-barred. However, the court finds that the incidents occurring in 2003 are "less serious" only in comparison to the utterly depraved conduct which, it is alleged, the defendant perpetrated prior to that time. Standing by themselves, the allegations of Frazier's conduct in 2003 –– punching the plaintiff, groping her, and otherwise engaging in threatening behavior –– are all acts of intentional misconduct, and would in the court's view themselves provide a basis for the imposition of punitive damages.

IT IS ACCORDINGLY ORDERED this 27th day of March, 2006, that the Motion for Summary Judgment of defendant Derby Enterprises (Dkt. No. 17) is denied; the Motion for Summary Judgment of defendant Frazier (Dkt. No. 20) is granted in part and denied in part as provided herein.

s/ J. Thomas Marten  
J. THOMAS MARTEN, JUDGE